AIRCO INDUSTRIAL GASES,
INC., Plaintiff,

v.

TEAMSTERS PENSION TRUST FUND
OF PHILADELPHIA AND
VICINITY, Defendant.

Civ. A. No. 84–123 MMS.

United States District Court,
D. Delaware.

Aug. 28, 1987.

Stanley William Balick, Wilmington, Del., for plaintiff; Robert J. Bray, Jr. and Stephen M. McManus of Robert J. Bray & Associates, Philadelphia, Pa., of counsel.

Francis J. Trzuskowski of Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, Del., for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Airco Industrial Gases, Inc. ("Airco") has brought suit for restitution of overpayments made on behalf of two employees to the Teamsters Pension Trust Fund of Philadelphia and Vicinity ("Fund"). Plaintiff originally brought this action under the Labor Management Relations Act, the Employee Retirement Income Security Act of 1974 ("ERISA"), and the state common law of unjust enrichment. The Court dismissed those claims, but permitted plaintiff to amend the complaint to bring a cause of action under the federal common law of

**894**

unjust enrichment arising under ERISA, 29 U.S.C. § 1103(c)(2)(A)(ii). *Airco Industrial Gases, Inc. v. Teamsters Health and Welfare Fund,* 618 F.Supp. 943, 950–51 (D.Del. 1985).

The Court conducted a four-day trial on March 9–12, 1987, and oral argument was held on June 2, 1987. This opinion constitutes the Court's findings of fact and conclusions of law, as prescribed by Federal Rule of Civil Procedure 52(a). The Court finds the Fund's policy concerning employer overpayments was to refuse all requests for refunds, and this policy was not arbitrary and capricious. In light of the Fund's waiver of the "no refund" policy, as applied by its audit department manager, to cover overpayments back to January, 1983, the Court will order a refund of Airco's overpayments from January to April, 1983. The Court will deny plaintiff's request for attorney's fees and interest.

## I. FINDINGS OF FACT

In June, 1986, Walter Dobromilski and John Lucas returned to Airco's employ as truck mechanics after having worked for a contract hauler for a period of years. The Airco plant in Pedricktown, New Jersey, where they worked, had two collective bargaining agreements with Teamsters Local Union No. 197: a production contract and a distribution contract. The production contract covered maintenance employees, including truck mechanics, and required Airco to make pension contributions to a private plan. The distribution contract, which covered approximately 15 employees, mandated contributions to the Fund, which is a multiemployer pension plan as defined by ERISA. 29 U.S.C. § 1002(37)(A). This contract was part of the National Master Freight Agreement and the Philadelphia Supplement until 1982. Plaintiff's Exhibit ("PX") 30.

Upon their rejoining Airco, a clerk in Airco's payroll department added Dobromilski and Lucas' names to the monthly contribution report form provided by the Fund for the pension plan. As they were covered by the production contract, however, the company was not to contribute to the Fund on their behalf. Under the Fund's established procedure, an employer would add or subtract employee names from the reports and the Fund would then make the necessary changes in listing the names on future reports sent to the employer. The responsibility for properly reporting and remitting contributions falls on the employer, not the Fund.

There is no question the mistake was due to Airco's negligence, and that it was entirely inadvertent. One possible explanation for the error is that Dobromilski and Lucas worked in Airco's distribution department, and this may have caused the payroll department to assume they were covered by the distribution contract instead of the production contract. The reason for the mistake is unimportant, and Airco erroneously paid the Fund $25,831.41 between June, 1976, and April, 1983.

Airco fortuitously discovered the error when Edward Ryan, head of the payroll department, mentioned Dobromilski and Lucas' status to Steve Toronye, a member of the labor relations department. Upon further investigation by Mr. Toronye, Airco learned it had mistakenly made pension contributions for employees who had no right to receive benefits from the Fund. On July 6, 1983, Mr. Toronye sent a letter to the Fund requesting a refund of the mistaken payments. After receiving no response, a second letter was sent on August 29. The Fund denied Airco's refund request by a letter dated September 26, 1983.

The facts surrounding the overpayment are essentially undisputed.[1] The key question is what refund policy the Fund operat-

---

1. At trial plaintiff sought to prove the Fund had acted negligently in failing to note the unauthorized overpayments during a 1980 audit of the company. Defendant, on the other hand, impliedly argues Airco knew of the overpayments because different corporate employees had knowledge of Dobromilski and Lucas' status as

covered by the production contract. Whether one party *should* have discovered the mistake is immaterial in this equity action because the mere fact of a mistake having been made permits this Court to determine the question of restitution. The status of the mistake as unilateral or bilateral does not affect the analysis.

ed under when Airco submitted its refund request in July, 1983. Plaintiff contends the Fund continued a one-year refund policy first adopted in June, 1979. Defendant argues it amended its policy in March, 1981, in response to the Multiemployer Pension Plan Act Amendments ("MPPAA"), by instituting a "no refund" policy. This latter position changed in July, 1984, back to a one-year refund.

Prior to the passage of MPPAA in 1980, ERISA § 403(c)(2)(A) provided,

> In the case of a contribution which is made by a mistake of fact, paragraph (1) shall not prohibit the return of such contribution within one year after the payment of the contribution.

29 U.S.C. § 1103(c)(2)(A) (1976). The problem multiemployer pension plans confronted for post-ERISA overpayments was distinguishing between mistakes of law and fact, an issue on which the statute provided minimal guidance. On June 7, 1979, the Fund adopted a refund policy outlined by its co-counsel, Mr. Thomas Jennings, which stated:

> If it is determined that the excess contribution was clearly the result of a 'mistake of fact' and that there are no outstanding delinquencies owed to the Fund(s) to which an overpayment was made, then the employer would be entitled to a refund for the total amount of the excess contributions (minus the amount of any claim(s) honored by that particular Fund(s) as a result of said overpayment) received by the Fund(s) within one (1) year prior to the date of receipt of the employer's written request for a refund.

PX 71, at 5; *see* PX 20, at 3. The policy did not attempt to define mistakes of fact, and the Fund determined that it would seek judicial resolution in order to clarify the law. Trial Transcript ("Tr.") C–74. In 1977, the Fund had refused an employer refund request on the ground that the only mistake was one of law. The subsequent lawsuit was before the United States District Court for the Eastern District of Pennsylvania at the time the Fund adopted the one-year refund policy. The court ren-dered a decision favorable to the Fund on October 30, 1979. *AAA Trucking Corp. v. Teamsters Pension Trust Fund,* 480 F.Supp. 579 (E.D.Pa.1979). The decision was subsequently vacated and the case ordered dismissed by the Court of Appeals for the Third Circuit for lack of subject matter jurisdiction. 633 F.2d 209 (3d Cir. 1980); *see Crown Cork & Seal Co. v. Teamsters Pension Fund,* 549 F.Supp. 307, 310 n. 4 (E.D.Pa.1982) (discussing appellate resolution of *AAA Trucking* ). The appellate court's dismissal in *AAA Trucking* took place on September 16, 1980, only ten days before the enactment of MPPAA.

The new act liberalized the permissible scope of overpayment refunds by eliminating the one-year limitation and the exclusion of overpayments made by mistakes of law. It provides:

> (2)(A) In the case of a contribution, or a payment of withdrawal liability under part 1 of subtitle E of subchapter III of this chapter—
>
> \* \* \* \* \* \*
>
> (ii) made by an employer to a multiemployer plan by a mistake of fact or law (other than a mistake relating to whether the plan is described in section 401(a) of Title 26 or the trust which is part of such plan is exempt from taxation under section 501(a) of Title 26), paragraph (1) shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake.

29 U.S.C. § 1103(c)(2)(A)(ii) (1982). Mr. Jennings noted that MPPAA presented the Fund with a new problem. The Trustees had to determine within six months of the date of enactment a policy for treating pre-MPPAA overpayments and act on outstanding employer refund requests. Tr. C–78. A failure to respond could, under Mr. Jennings' understanding, result in the Fund's liability for those excess contributions. In addition to this problem, a number of employers filed suit for return of overpayments shortly after MPPAA's passage. At this point, the parties strongly

disagree as to whether or not the Fund adopted a new policy concerning refunds.

Mr. Jennings prepared a memorandum prior to the Trustees' March 26, 1981 meeting. He outlined the effect of MPPAA on the overpayment refund question and specifically noted the lack of guidance in the act, its legislative history, and administrative regulations on the proper policy to adopt. PX 72, at 5–8. The memorandum also discussed pending litigation filed after MPPAA's passage, and focused attention on a suit filed by the Crown Cork & Seal Company as a good test case for determining the issue of jurisdiction over employer suits and the propriety of returning excess contributions. PX 72, at 8–9. Mr. Jennings concluded by presenting the trustees with three ways of proceeding:

*Alternative 1:* Return of all verified employer overpayments received on or after January 1, 1975.

The first alternative would be the return of all verified employer payments (less any appropriate set offs) that were received by the Fund on or after January 1, 1975. Inherent within this alternative is a determination by the Fund administrator that these overpayments were made by a mistake of fact or law.

\* \* \* \* \* \*

*Alternative 2:* Agreement to toll statute of limitations

Pending further clarification of the relevant statutory amendments, including the resolution of any constitutional issues presently before the United States District Court for the Eastern District of Pennsylvania in the case of *Crown Cork and Seal v. Teamsters Health and Welfare and Pension Funds,* the Funds may adopt a resolution agreeing to toll any applicable statutes of limitations upon the dates of receipt of such written request from any affected employer. Written notice of such a resolution would be supplied to all employers who have requested the return of mistaken contributions.

\* \* \* \* \* \*

*Alternative 3:* Withhold the repayment of any employer refunds while simulta-neously filing a formal request with the United States Department of Labor seeking a clarification of the application of MEPPA amendments to the return of employer contributions.

PX 72, at 10–13. After discussing the question, the Trustees unanimously adopted the following policy:

There followed a discussion regarding the obligation of the Trustees and other fiduciaries of the Fund with respect to the retention and return of mistaken employer contributions as a result of the recent amendments to ERISA. Thomas W. Jennings, Esquire, on behalf of himself and Jeffrey S. Orchinik, Esquire, presented a detailed Report on this matter stressing the fact that approximately 240 employers in addition to the Crown Cork & Seal Company have demanded the refund of overpayments mistakenly made to the Fund. After considerable discussion, motion was made and seconded and unanimously adopted that the Fund would:

(a) Attempt to avoid an onslaught of litigation by agreeing to toll any relevant statute(s) of limitations which might be applicable, upon request for any affected employer;

(b) Request this Court to issue a stay of all similar litigation presently pending within this district filed after the instant matter; and

(c) Simultaneously file a formal written exemption with the U.S. Department of Labor seeking a clarification concerning the application of the September 26, 1980 amendments to ERISA pertaining to the return of employer contributions made by mistake of fact or law.

It was stressed that the Crown Cork & Seal litigation may become the 'test case' which may ultimately determine the nature and scope of the Fund's liability to employers.

PX 21, at 2–3.

The Trustees' minutes, which accurately reflect what transpires at a meeting, Tr. 87, do not explicitly show the revocation of

the pre-MPPAA one-year refund policy. The Trustees appeared to adopt the second and third of Mr. Jennings alternatives, but left out any specific mention of the "no refund" aspect of the third option, making it unclear whether the trustees in fact accepted that policy. Mr. Jennings testified the Trustees determined to refuse all refund requests and use the lawsuit brought by the Crown Cork & Seal Company as the "test case" for determining what policy, if any, the Fund should adopt under MPPAA. Tr. C–79–80. Reviewing the March 26, 1981 minutes as a whole, especially the reference to pursuing a "test case," leads to a preliminary conclusion that the Trustees did adopt the "no refund" policy as the safest, most conservative approach in light of MPPAA's ambiguity. The record contains evidence, however, of subsequent acts by the Fund which obfuscates the exact policy the Trustees had adopted when Airco requested a return of overpayments in July, 1983. The Court will review the evidence before reaching its factual conclusion.

The minutes from the October 6, 1982 meeting indicate a one-year refund policy in effect. Mr. Charles Schaffer, the Fund Administrator, requested a clarification from the Trustees "that any refunds of contributions would be calculated from the date on which the audit of employee's records was commenced, for a period of one (1) year preceding that date." PX 22, at 3. Mr. Schaffer testified that his request was "purely for housekeeping" in order to confirm the total amount of overpayments prior to MPPAA under ERISA's old one-year rule. Tr. C–120. The minutes are at best ambiguous because they neither confirm nor deny the Administrator's testimony. At the time of the Trustees meeting, however, the District Court had not issued a decision in *Crown Cork & Seal.* The Fund still faced uncertain terrain on refund requests under MPPAA, and its fiduciary responsibilities to the beneficiaries required that it know what potential liabilities existed if the test case results went against the Fund.[2] The Court credits Mr. Schaffer's testimony that his inquiry to the trustees at the October, 1982 meeting was only for the purpose of establishing internal guidelines and not a reflection of a Fund policy to permit refunds for up to one year.

The District Court's decision in *Crown Cork & Seal* on October 13, 1983, held that ERISA "imposes no requirement on the trustees to return mistaken contributions.... To impose a right of restitution in favor of employers could severely undermine the fund's integrity." 549 F.Supp. at 311–12. The Court explicitly rejected finding an implied cause of action to recover overpayments under § 1103(c)(2)(A)(ii). The Third Circuit Court of Appeals affirmed the decision without opinion on July 13, 1983, one week after Airco submitted its refund request. 720 F.2d 661 (3d Cir. 1983). On September 26, 1983, the Fund denied Airco's request, stating that in light of the affirmance in *Crown Cork & Seal* it had "concluded that no overpaid contributions shall be returned to *any* employer."[3] PX 5 (emphasis added).

---

**2.** One district court decision that did provide some guidance for the Fund at this time was *Fuller Cinder Co. v. Central States Pension Fund,* 2 Employer Benefits Cas. 2458 (E.D.Mich.1982). In *Fuller Cinder,* the court held § 1103(c)(2)(A)(ii) was permissive, not mandatory, in its grant of power to trustees to refund overpayments. *Id.* at 2460. The court then found the pension fund's one-year refund policy to be reasonable. *Id.* The Fund's counsel was aware of *Fuller Cinder,* Tr. C–80, and the Court can fairly assume Mr. Schaffer had been apprised of the case.

**3.** The complete text of the Fund's letter to Airco is as follows:

Recently, the Federal Appeals Court in Philadelphia ruled that an employer has no right of action under the Employee Retirement Income Security Act of 1974, as amended, for the return of mistakenly-made contributions to multiemployer funds. The case entitled *Crown [Cork] and Seal, Inc. v. Teamsters Pension Trust of Philadelphia, and Vicinity, et al,* held that the Trustees of the Health & Welfare and Pension Funds have the sole and exclusive authority and responsibility to manage the assets of the Funds. As such, the Court ruled that there is no right of action by an employer for the return of overpaid fringe benefit contributions. This determination was in keeping with the language of the statute which provides that the Trustees have the sole responsibility to manage the assets of the

At the Trustees meeting the following day, September 27, Mr. Schaffer presented a draft of the letter sent to Airco indicating the Fund's policy in light of the *Crown Cork & Seal* affirmance. PX 23. The minutes do not indicate whether the Trustees ever discussed the letter or took any formal action to approve its use. Mr. Schaffer testified the Trustees had officially adopted the letter as the Fund's policy at the September 27 meeting, and that he failed to note it in the minutes until the meeting on November 3, 1983. At that meeting, the minutes state, "Mr. Schaffer next reported and the Trustees unanimously agreed that there would be no voluntary return of employer contribution payments in light of the decision of the Court of Appeals for the Third Circuit in the *Crown Cork & Seal* case." PX 24. Whether the Trustees "adopted" the letter as an official expression of Fund policy on September 27 or November 3 is immaterial in light of the fact plaintiff's refund request came well before the letter was drafted; the Court finds that at one of the meetings the trustees did ratify Mr. Schaffer's decision to send the letter to employers who had requested refunds.[4] The timing of the letter to Airco, sent one day before Mr. Schaffer presented the draft to the Trustees, is similarly irrelevant to the determination of what policy the Fund had in effect when Airco made its request.

Plaintiff argues the November 3, 1983 meeting marks the first official Trustee action to adopt a new "no refund" policy. It asserts no other evidence exists in the minutes showing a decision by the Fund to alter the original one-year refund policy first adopted in 1979. As support for its position, Airco points to an exchange between the Fund's auditing department and an employer concerning overpayments that casts doubt on whether the supposed "no refund" policy was ever put into effect. On March 6, 1984, McLean Trucking Company notified the Fund that overpayments to the Pension and Health and Welfare funds in the amounts of $1,195.39 and $1,237.13, respectively, had been made for November and December, 1983, and requested a refund. PX 75. The Fund's auditing department responded on March 13, 1984, as follows:

I am in receipt of your letter dated March 6th concerning the overpayments that were made for employees on the November and December reports. I have gone over this with our Audit Manager, Frank Duffy. He has indicated that the information sent is not sufficient. We will need copies of the time cards for each employee before we can allow credits. If it is too much a problem to send them, we can send an auditor to your company to do a payroll audit for the period in question.

I hope to hear from you shortly.

PX 73.

After an exchange of information, on November 17, 1984 the Fund permitted McLean Trucking a credit against an outstanding balance owed. PX 77. In July, 1984, the Fund had adopted a one-year refund policy ostensibly permitting return

Funds for the sole and exclusive benefit of the participants and beneficiaries.

In accord with this decision, the Trustees of the Teamsters Health and Welfare and Pension Funds of Philadelphia and Vicinity have concluded that no overpaid contributions shall be returned to any employer. Likewise, in accord with the reasoning of the United States Court of Appeals in the matter of *Crown Cork and Seal*, the Trustees have further determined that no contributing employer shall be entitled to an offset against delinquent contributions due and owing.

Should you have any further questions or would like to review a [sic] the opinion of the United [S]tates District Court please contact me and I will direct you to our attorney who handled the case so that any questions may be answered to your satisfaction.

PX 5.

4. Plaintiff's proposed admission of facts submitted to defendant states the following: "At the November 3, 1982, meeting of the trustees of Defendant Teamster Pension Fund, the trustees unanimously agreed to adopt a policy whereby there would be no voluntary return of employer contribution overpayments." Defendant responded, "Admitted." PX 57, ¶ 23. If it were necessary for the Court to determine when the Trustees had adopted the letter as a statement of Fund policy, the evidence weighs for a finding that the Trustees acted on November 3, and not September 27.

of overpayments back to July of 1983. The timing of the credit to McLean Trucking falls under the new policy, but plaintiff argues the March 13 letter indicates the Fund's willingness to grant a refund despite the "no refund" policy in effect at the time. Defendant points out that McLean Trucking never received a copy of the September 27, 1983 draft letter presented to the Trustees despite the "no refund" policy having been in effect at least four months prior to the refund request.

The Court does not draw the inference concerning the McLean Trucking transaction that the plaintiff requests. In July, 1984, the Trustees unanimously adopted a resolution creating a one-year refund policy.[5] PX 10. The resolution had been the subject of extensive discussion among Fund personnel, outside consultants, and the Trustees. Tr. B–88–94. The Fund's failure in March, 1984 to send a letter denying McLean Trucking's request does not thereby prove the absence of a "no refund" policy, and the actual refund came well after the adoption of a new refund policy and verification of McLean Trucking's claim.

The record contains no evidence contemporaneous to the period from September,

1981 to November, 1983, when defendant asserts it also operated under a "no refund" policy. Two letters, one from the Fund and the other from an employer, do refer to the Fund's policy during this period. The letters were written in the context of the Fund's offer in December, 1985, to permit employers to file refund claims back to July, 1983.[6] The letter from the Fund, dated January 8, 1986, references the employer's prior request for a refund on September 7, 1983, and states, "At that time the Funds [sic] policy was not to return any overpaid contributions." DX 23–A. The employer's letter, dated January 2, 1986, refers to correspondence with Mr. Frank Duffy, the Fund's audit manager, on February 14, 1983. The letter states, "... fund policy prohibited granting contributing employers credit for overpayments made as a mistake of fact or law." DX 19.

Although the original correspondence disclosing the Fund's denial of a refund would have been preferable, the letters in the record carry significant weight. The employer's letter is not open to charges of being self-serving and a *post hoc* justification. The date of the Fund's refusal on the basis of a "no refund" policy is only a few months prior to Airco's refund request. The Fund's January 8, 1986, letter is also

---

5. The Resolution states in pertinent part:

NOW, THEREFORE, on this 7th day of July, 1984, it is hereby resolved by the Board of Trustees of the Teamsters Pension Trust Fund of Philadelphia and Vicinity as follows:
1. Subject to the terms and conditions of this Policy, a participating Employer who makes a contribution to the Trust Fund in excess of the amount required by the terms of that Employer's collective bargaining agreement and under a mistake of fact or law may request a refund of only the principal amount of such excess contribution (less the set-offs and expenses described herein) that have been made to the Trust Fund within the one (1) year period immediately preceding the Trust Fund's receipt of a written request made pursuant to this Policy.
2. No refund of excess contributions shall be granted by the Trust Fund without a written request for such refund having been received within one (1) year after the date that such excess contributions were received by the Trust Fund.
3. The obligation to discover and delineate the amount of excess contributions within the time limits provided within this Policy is the

sole and exclusive responsibility of the Employer.
PX 10, at 3–4.

6. On October 25, 1985, the Fund adopted a resolution permitting employers to file claims for contribution overpayments within thirty days, to be limited to amounts paid after July 1, 1983. PX 13. This was a one-time waiver for payments made more than one year prior to the claim, and all future overpayments would be governed by the one-year refund policy adopted in July, 1984. After a letter from Mr. Schaffer explaining the operation of the resolution was sent undated, a second dated mailing went out on December 3, 1985. PX 27.

Mr. Frank Duffy, head of the Fund's auditing department with responsibility for implementing the overpayments refund program, misread the resolution and permitted refunds back to January, 1983. Tr. A–134–35. The record contains four examples of refunds covering the period between January and July, 1983, which would not have been permitted if the Resolution was applied properly. See DX 25–A, 26–A, 29–A, 30–A. Airco did not file a claim for refund under the resolution.

probative because it is recounting the reason for the initial denial of any refund and explains why only the amount paid in January, 1983, and not prior months, could be returned. The correspondence does not appear to be self-serving or designed to do anything more than explain the Fund's prior acts. The letters show the Fund consistently applying a "no refund" policy during the period Airco requested a refund.

The Court also credits the testimony of Mr. Jennings that the Trustees adopted his recommendation in March, 1981, to refuse all refund requests. The minutes from the meeting show the adoption of a very conservative course for the Fund, a position Mr. Jennings stated he consistently advocated. Moreover, the Court credits his testimony that the excess contribution problem was but a small part of the broad challenge MPPAA posed to multiemployer funds initially to figure out and then apply the statute. The minutes' failure to note explicitly the adoption of a "no refund" policy until November, 1983, does not automatically mean the policy was not adopted. The legal memorandum prepared for the March, 1981 Trustees' meeting, the minutes' notation that Mr. Jennings' conservative options were adopted, and the later correspondence all support the testimony that a "no refund" policy came about in March, 1981.

The Fund's acts have not been a model of consistency. After adopting the one-year refund policy in July, 1984, it refused to return overpayments on the basis of *Crown Cork & Seal* in August, 1984. PX 11, 12. These letters were sent when a refund policy was in place, but McLean Trucking did not receive a refusal letter despite requesting a refund during the period of the "no refund" policy. Moreover, Mr. Duffy's administration of the refund policy in January, 1986 misapplied the terms of the Trustees' resolution and permitted returns of excess contributions for an additional six months back to January, 1983. The Fund's occasional failures to act consistent with its stated policy, and to record clearly and apply its decisions, has made the Court's factual analysis much more difficult than necessary. In review-

ing the record and testimony, however, and in weighing the parties' proposed interpretations of the Fund's acts, the Court finds the Fund adopted a "no refund" policy in March, 1981. The Fund did act consistently throughout the period from March, 1981, until July, 1984, when it adopted a new policy. The *Crown Cork & Seal* litigation, used as a test case to provide guidance, and the refusal to issue refunds to other employers in addition to Airco demonstrate the conservative path taken by the Trustees.

The factual finding concerning the exact policy the Fund had when Airco requested a refund is crucial to the legal analysis of the claim for restitution. The question of unjust enrichment will turn in large part on whether the "no refund" policy was arbitrary and capricious.

## II. CONCLUSIONS OF LAW

### A. The Fund's Policy

In finding a cause of action under the federal common law of unjust enrichment through ERISA, the Court took a different tack from other courts that had considered the issue. The Court of Appeals for the Ninth Circuit found an implied cause of action for employers under § 1103(c)(2)(A)(ii), applying the familiar *Cort v. Ash* test. *Award Service, Inc. v. Northern California Retail Clerks Unions,* 763 F.2d 1066, 1068 (9th Cir.1985). Courts had previously permitted employers to sue for restitution of overpayments, but none had extensively analyzed the statutory basis on which the claim could be brought. *See Chase v. Trustees of the Western Conference of Teamsters,* 753 F.2d 744 (9th Cir.1985); *Peckham v. Board of Trustees,* 719 F.2d 1063, *modified and reaff'd,* 724 F.2d 100 (10th Cir.1983); *Teamsters Local 639–Employers Health Trust v. Cassidy Trucking, Inc.,* 646 F.2d 865 (4th Cir.1981); *E M Trucks, Inc. v. Central States Southeast & Southwest Areas Pension Plan,* 517 F.Supp. 1122 (D.Minn.1981). The District Court in *Crown Cork & Seal* rejected a cause of action for employers under the statute, al-

though it did not explicitly consider a federal common law claim. 549 F.Supp. at 311–12.

Since this Court issued its opinion in September, 1985, five cases have considered the issue of an employer's restitutionary right under § 1103(c)(2)(A)(ii). Two decisions have refused to find either an implied cause of action or a federal common law claim of unjust enrichment. *See Dime Coal Co., Inc. v. Combs*, 796 F.2d 394, 399 & n. 7 (11th Cir.1986) (applying *Cort v. Ash* and also holding "no federal common law right to recovery of the disputed contributions"); *McHugh v. Teamsters Pension Trust Fund of Philadelphia*, 638 F.Supp. 1036, 1048–49 (E.D.Pa.1986) (relying on *Crown Cork & Seal* ).[7] Two cases have permitted employer suits for overpayment refunds to go forward, and the Sixth Circuit Court of Appeals has specifically recognized the federal common law basis of the claim. *Whitworth Brothers Storage Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 794 F.2d 221, 235–36 (6th Cir.1986); *Dumac Forestry Services, Inc. v. International Brotherhood of Electrical Workers*, 637 F.Supp. 529, 532 (N.D.N.Y.1986), *aff'd in part, rev'd in part*, 814 F.2d 79 (2d Cir.1987). Finally, the Second Circuit Court of Appeals' decision in *Amato v. Western Union International, Inc.*, 773 F.2d 1402 (2d Cir. 1985), which had rejected an unjust enrichment claim under ERISA in a somewhat different context, is no longer applicable to § 1103(c)(2)(A)(ii) suits after the Court's implicit recognition of the cause of action in *Dumac Forestry*.

Although the number of courts that recognize a cause of action for restitution is growing, only two have actually considered whether to grant the refund of overpayments. The existing case law has addressed, for the most part, only "whether an aggrieved employer may sue for excess contributions." *Dumac Forestry*, 637 F.Supp. at 533. In *Peckham*, one of the earliest decisions in this area, the Tenth Circuit Court of Appeals affirmed the Dis-

trict Court's restitution order "on grounds that it would be an abuse of the trustees' discretion to deny the refunds under the circumstances of this case." 719 F.2d at 1066. The Circuit Court apparently adopted the arbitrary and capricious standard applicable to review of the trustees' actions under ERISA without considering the equitable basis of the action. In *Dumac Forestry*, the District Court reviewed whether the refund policy adopted by the trustees was arbitrary and capricious in determining the amount of the refund. 637 F.Supp. at 532–33. The Second Circuit Court of Appeals accepted the use of the arbitrary and capricious standard, but added another requirement: "whether restitution would undermine the financial stability of the plan." 814 F.2d at 83 (quoting *Award Service*, 763 F.2d at 1069).

The general approach outlined in the *Dumac Forestry* opinions is appealing because it merges general equity principles with the policies and standards of ERISA for protecting the rights of beneficiaries. Unjust enrichment, which is the foundation for the cause of action for restitution, generally requires the plaintiff to have conferred a benefit, and the acceptance and retention of that benefit by defendant. In addition, "Even where a person has received a benefit from another, he is liable to pay therefore only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." *Restatement of Restitution* § 1 comment c (1937). A simple balancing of the equities is not possible because the basis for the cause of action is ERISA, and the court is not acting solely as a court in equity. The legal standard for reviewing a plan's policy for handling employer refund claims, therefore, must include the policies of ERISA.

One of ERISA's overriding policies is "the assets of a plan shall *never* inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1) (emphasis added). In considering whether a fund's retention of overpayments is "unjust," restitution must be

---

7. The Court notes that the Fund is the defendant both here and in *McHugh* and *Crown Cork &* *Seal,* and that the courts have arrived at contradictory conclusions.

limited to prevent dissipation of the plan's assets. The trustees, who are invested with the fiduciary duty to administer plans "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(1), are the best judges of whether a refund of overpayments violates ERISA's requirements. The arbitrary and capricious standard applied to review the trustee's acts will determine whether, under the law of restitution, the retention of any or all excess contributions by a fund is "unjust."[8] One facet of determining whether the policy violates the statutory standard will be whether a fund's actuarial stability will be threatened by an award. *Dumac Forestry*, 814 F.2d at 83.

Under the arbitrary and capricious standard, "A plan interpretation should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan." *Gaines v. Amalgamated Insurance Fund*, 753 F.2d 288, 289 (3d Cir.1985). Although *Gaines* involved a fund's interpretation of the plan to deny disability benefits, the deferential standard articulated by the Third Circuit Court of Appeals is equally applicable to review of excess contribution refund policies. *Cf. Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 321 (6th Cir.1984).

Plaintiff argues the only basis on which the Fund adopted the "no refund" policy was its position in the *Crown Cork & Seal* litigation that employers had no cause of action under § 1103(c)(2)(A)(ii). Airco asserts the Fund took this position without regard for the beneficiaries as evidenced by the subsequent switch to a one-year refund policy because, according to Messrs. Schaffer and Jennings, it would be more "fair" to the employers. Tr. B–136, C–88. Under plaintiff's theory, the "no refund" policy was arbitrary and capricious because it was not based on considerations of the

fund's actuarial status or with regard to the Trustee's fiduciary duties.

The adoption of the "no refund" policy in March, 1981, was not the product of precipitous action. Mr. Jennings' detailed memorandum outlining the various options the Fund could follow after MPPAA was the springboard for a "considerable discussion," according to the minutes. PX 21. Moreover, the context in which the change of policy arose is important for an evaluation of the Trustees' decision. MPPAA significantly altered a number of provisions of ERISA, and the amendment to § 1103(c)(2) contains no guidance in the legislative history on how the Trustees were to formulate a refund policy. Upon MPPAA's passage, a number of employers filed suit to recover excess contributions, and the Fund faced unknown liability if it permitted refunds. The Trustees faced the twin pressures of time, in that MPPAA required some action on refunds within six months of passage, and uncertainty as to what course of action would fulfill their fiduciary duties.

The actuarial status of the Fund in 1981 is an additional consideration in determining whether the trustees properly exercised their discretion. During 1980, the Fund's unfunded vested liability was $316,306,175, and increased to $351,761,078 in 1981. The ratio of assets to total vested liability stood at 28% in 1980, and only increased to 29% in 1981. DX 53. The number of plan participants was also declining during this period, putting an even greater strain on the fund, Tr. C–176, and liabilities for vested members exceeded assets. Tr. C–184. According to Mr. Stephen Kurash, the Fund's actuary, the asset to vested liability ratio for the Fund is low compared to industry standards, even today. Tr. C–194.

■ The context in which the Trustees' adopted the "no refund" policy in 1981 and their extensive review of various options shows a considered exercise of discretion.

---

**8.** The parties expended considerable energy arguing whether restitution could be ordered if the overpayments were the result of a unilateral mistaken. MPPAA eliminates the distinction between mistakes of law and fact as a basis for returning excess contributions, and the trustees held broad discretion on whether to permit refunds. The question of whether one or both parties should have known of Airco's mistaken contributions is irrelevant to considering whether the Trustees "no refund" policy was arbitrary and capricious.

The "no refund" program was a fair response to an ambiguous statute and financial situation where the Fund was in a precarious position. A decision to permit return of excess contributions could have further endangered the plan's assets and may have constituted a breach of fiduciary duty. The "no refund" policy is also a logical complement to the Trustees' decision to push forward the *Crown Cork & Seal* litigation as a "test case" to secure judicial guidance. As a conservative plan facing an uncertain terrain, the "no refund" policy protected the Fund until the *Crown Cork & Seal* court could interpret § 1103(c)(2)(A)(ii). The Trustees' acts in this regard were rationally related to ERISA's requirements, and I find the "no refund" policy was not arbitrary and capricious. *Cf. Trustees, Central California Production Workers' Fund v. Acosta,* 6 Employer Benefits Cas. 2697, 2698 (N.D. Cal.1985) [Available on WESTLAW, DCT database].

■ The Fund's denial of Airco's refund request in September, 1983, was valid under the policy in effect at the time. The Fund's change to a one-year refund policy in July, 1984 would not have affected plaintiff's claim but for the expansion of time under Mr. Duffy's interpretation of the resolution to include claims from January to July, 1983. Airco did not request a refund during the thirty-day waiver period in December, 1985, and the Fund asserts that Airco cannot now seek to recover overpayments from those months. Airco had, however, filed suit in March, 1984, claiming amounts from 1976 through April, 1983, and the Fund had notice of the claim. The Fund's policy, as implemented by Mr. Duffy, cannot permit some employers to recover excess contributions while denying recovery to another employer in a virtually identical position.

■ The plaintiff has not challenged the December, 1985 waiver permitting claims back to January, 1983 as arbitrary and capricious. The basis for the one-time waiver was to clear up outstanding refund claims in a single action. If the court were to order restitution of Airco's excess contributions from January to April, 1983, there would be no threat to the Fund's actuarial integrity. Mr. Kurash testified that a refund of Airco's entire claim, totaling more than $25,000, would not have an adverse impact on the Fund. Airco's status as a claimant to its January-April, 1983 excess contributions is unique, in that it is the only employer to have had an outstanding lawsuit for overpayments in December, 1985. The Fund's notice of Airco's claims came through the lawsuit and not the route required by the Fund. It is highly doubtful whether any other employer could also assert a refund claim for excess contributions during the relevant period who had not given the Fund some notice of its claim. An order for restitution, therefore, would not present the possibility of an unknown number of employers asserting claims similar to Airco's that could threaten the Fund's actuarial integrity.

For the Fund to refuse to refund the erroneous overpayments from January to April, 1983 on the basis of Airco's failure to file the necessary request with the Fund when Airco had already brought a lawsuit would be arbitrary and capricious. In considering the equities of plaintiff's claim, I will order the Fund to return all excess contributions Airco made on behalf of Messrs. Dobromilski and Lucas from January to April, 1983, in accord with defendant's refund policy as implemented by Mr. Duffy in January, 1986. According to the defendant, the amount Airco overpaid for that period is $1,568.00, which is subject to any necessary audits the Fund must conduct to confirm the exact figures.[9]

---

9. Defendant argues Airco's claim is barred by the statute of limitations and laches, proposing the six-month or one-year periods in § 1103(c)(2) as the appropriate limitation period. Even assuming *arguendo* an employer's claim must be brought within six months of discovering the mistaken contribution, plaintiff filed its refund request within three months of determining an error had been made, and within six months of the Fund's denial of a refund. Airco's claim was timely in this case, and the court need not decide what statute of limitations period applies to federal common law restitution actions.

## B. Interest on the Award

Plaintiff has requested the Court to award interest on any amount the Fund must repay as restitution. The only provision under ERISA that expressly permits an award of interest is 29 U.S.C. § 1132(g)(2), but the only persons permitted to bring an action under the subsection are plan fiduciaries. Plaintiff concedes there is no statutory provision permitting an employer to recover interest, but argues the Court's equitable powers permit it to compensate fully an employer receiving restitution under the federal common law of unjust enrichment.

Only two cases have considered the question of interest on a restitutionary award. In *Peckham,* the Sixth Circuit Court of Appeals initially held that "[g]eneral principles of restitution require the pension fund to pay interest." 719 F.2d at 1066. The court subsequently rescinded its award of interest on the basis of a proposed tax regulation prohibiting plans from returning earnings derived from excess contributions or overpayments. 724 F.2d at 101. The court bowed to the Internal Revenue Service's expertise in his area, *id.,* but the proposed regulation never became effective. In *Dumac Forestry,* the Second Circuit Court of Appeals affirmed the district court's denial of interest on the ground that interest cannot begin to accrue until a lawful demand for restitution has been made and the defendant's good faith in refusing the demand can be assessed. 814 F.2d at 83. The Court seemed to recognize implicitly that an employer could recover interest on its excess contributions. The district court in *Dumac Forestry* refused to award interest on the ground that it would violate § 1103(c)(1) by permitting assets to inure to the benefit of an employer. 637 F.Supp. at 534. Neither circuit court considering the question analyzed whether an interest award to an employer comports with the policies of ERISA. As noted previously, a court's exercise of its equitable

power to consider a claim for restitution under federal common law is tempered by the requirements of ERISA, including the fiduciary duties imposed on the trustees. Any decision in this area must not contravene ERISA's policies.

The fundamental precept of § 1103(c)(1) is the anti-inurement provision and direction that assets "shall be held for the *exclusive* purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." (emphasis added) Section 1103(c)(2)(A)(ii) permits the return of excess contributions, but it is only an exception to the general protective policy, not a mandate to return all overpayments. *Dumac Forestry,* 814 F.2d at 82; *Teamsters Local 639–Employers Health Trust,* 646 F.2d at 868. Interest, which is the accrued value of money over time, is not a part of the overpayment but an incident of it.

The amount of interest a court might award comes directly from the plan's assets and will deprive participants and beneficiaries of its use. The plan will incur expenses in collecting the funds, auditing accounts, and ultimately litigating the question of overpayments, all part of the exercise of the Trustees' fiduciary duty to protect the fund. The excess contributions will have been commingled with other plan assets, and restitution of them is not a simple process of taking money previously set aside. The decision to order restitution is an effort at correcting an injustice, but payment of interest means an amount greater than that paid in as excess contributions may be awarded while the fund has encountered certain costs related to the overpayments. An award of interest, therefore, could cost the fund more than if the excess contribution had never been made.

There is no doubt that, if a plan is protected from paying interest on over-

---

Defendant also asserted plaintiff should be equitably estopped from asserting the claim because it was solely responsible for the erroneous contributions. Although Airco has a duty to accurately report its payments to the Fund, it did not have knowledge of the mistaken character of its overpayments or misrepresent the contributions. There is no basis for an equitable estoppel defense.

payments it is subsequently ordered to return, it will reap a benefit from the unjust retention of the contribution. The potential cost to the plan if interest awards are permitted, however, would violate § 1103(c)(1)'s policy of protecting the Fund's assets. Although the possibility of diminishing a plan's assets may appear remote, the need to ensure full protection of those assets weighs in favor of limiting restitution to the amount of the excess contribution. Therefore, I will deny Airco's request for interest on the amount of restitution.

**C. Attorney's Fees**

■ Plaintiff has requested an award of attorney's fees as a prevailing party in the claim for restitution. Although the parties assumed the Court could award an employer attorney's fees in an action for return of excess contributions, there is a serious question as to whether ERISA permits such an award.[10] As with the question of interest, the Court must analyze whether an award of attorney's fees is permissible under the Court's equity power in light of ERISA's policies.

Two of ERISA's provisions permit an award of attorney's fees: § 1132(g)(1) and § 1451(e). Section 1132(g)(1) confers on the court discretion to make an award in actions brought by a participant, beneficiary, or fiduciary. Although Airco could qualify as a fiduciary if it exercised discretionary control or authority over the plan or its assets, *see U.S. Steel Corp. v. Commonwealth of Pennsylvania Human Relations Commission*, 669 F.2d 124 (3d Cir. 1982), plaintiff cannot qualify for an award under this section because it is suing only in its capacity as an employer. Section

1451(e) states: "In any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney fees, to the prevailing party." This fee-shifting provision, which permits employers to recover, is only applicable to suits involving a determination of employer withdrawal liability from a multiemployer pension plan. These cases will involve suits by plans seeking to enforce federal law as a means of fulfilling their fiduciary duty. *See Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund*, 799 F.2d 45, 49 (3d Cir.1986). Airco's cause of action does not fall within the provisions of § 1451(e), and its attorney's fee claim cannot be asserted under this section.[11]

The lack of a statutory basis for attorney's fees does not automatically prevent the award because the plaintiff's claim is equitable and the award is within the Court's power. ERISA's anti-inurement policy, however, again counsels strongly against permitting employers to recover attorney's fees for their restitution claims. If the award were made, the amount would come from the assets of the plan, thereby depriving participants and their beneficiaries of the plan's benefits. Moreover, the plan's actions in retaining the excess contributions and litigating the refund question would be an exercise of their fiduciary duty under § 1104. An award of attorney's fees would provide an individual employer with a direct benefit, drawn from a plan's assets, while discouraging trustees from taking actions that may, at some later date, be found arbitrary and capricious and constituting unjust enrichment.

10. In *Peckman,* the Sixth Circuit Court of Appeals affirmed the district court's exercise of discretion in denying attorney's fees on the ground that neither side had completely prevailed in the litigation. 719 F.2d at 1066. The district court in *Dumac Forestry* assumed an employer could assert a claim for attorney's fees, and denied the request. 637 F.Supp. at 534.

11. Plaintiff argues the analysis in *Dorn's Transportation* permitting employers to recover attorney's fees in withdrawal liability cases should

also be applied to employer restitution claims under § 1103(c)(2)(A)(ii). The Third Circuit Court of Appeals, however, established a rule permitting employers to recover in only limited circumstances where a plan's suit was "frivolous, unreasonable, or without foundation." *Id.* at 50. The circuit court was particularly concerned with protecting the plan from any unreasonable burden in fulfilling its fiduciary duty in accordance with the policies of ERISA and MPPAA.

The parameters of the federal common law cause of action under § 1103(c)(2)(A)(ii) are controlled by ERISA, and an employer's recovery of attorney's fees would contravene the statute's policies expressed in § 1103(c)(1). Therefore, I hold an award of attorney's fees to employers seeking restitution of excess contributions is not permitted, and plaintiff's request will be denied.

## III. CONCLUSION

The Court has found the Fund had a "no refund" policy in effect in July, 1983, when Airco first requested a return of overpayments, and the policy was not arbitrary and capricious. Under the December, 1985 waiver program permitting refunds, as applied by Mr. Duffy, back to January, 1983, the Fund had adequate notice of Airco's claim and the Court will order a refund of overpayments made in the period of January to April, 1983. Plaintiff's request for interst on the award and its attorney's fees will be denied. An order will be entered in accordance with this opinion.